**CASE NUMBER 24-10879**

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

**JAMIE CUNNINGHAM,**

Plaintiff/Appellant,

v.

**COBB COUNTY, GEORGIA and Cobb County Police Officers
EVAN MCDONALD, CHRISTOPHER LAKE, and JOHN GALLOWAY
in their individual capacities,**

Defendants/Appellees.

_____

ON DIRECT APPEAL FROM A FINAL ORDER
OF THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA

_____

**BRIEF OF APPELLANT**

_____

CRAIG T. JONES
Georgia Bar No. 399476
Craig T. Jones, P.C.
Post Office Box 66
Savannah, Georgia 31402
(678) 643-0062
craigthomasjones@outlook.com

*Attorney for Appellant Jamie Cunningham*

No. 24-10879
*Cunningham v. Cobb County*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1(a)(2), the following is a complete list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held company that owns 10% or more of the party's stock, and any other identifiable legal entities related to a party:

(1) Brown, Hon. Michael L. (trial judge)

(2) Cobb County, Georgia (defendant)

(3) Cobb County Attorney's Office (defense counsel)

(4) Cobb County Board of Commissioners (governing body of defendant)

(5) Cunningham, Jamie (plaintiff)

(6) Galloway, John (defendant officer)

(7) Jones, Craig T. and Craig T. Jones, P.C. (plaintiff's counsel)

(8) Lake, Christopher (defendant officer)

(9) Lloyd's, London and its subsidiary, Brit Global Specialty USA (insurer)

(10)   McDonald, Evan (defendant officer)

No.  24-10879
*Cunningham v. Cobb County*

(11) Laura J. Murphree (defense counsel)

(11)   Lauren S. Bruce (defense counsel)

(12)   H. William Rowling, Jr. (county attorney)

Respectfully submitted this 26th day of March, 2024.

<u>*/s/ Craig T. Jones*</u>
CRAIG T. JONES
Georgia Bar No. 399476
Counsel for Appellant

# TABLE OF CONTENTS

Certificate of Interested Parties and Corporate Disclosure Statement…….…...........2

Table of Contents………………………………………………………….…..………4

Table of Authorities………………………………… ……...................................6

Statement Regarding Oral Argument…………………………………………..10

Statement of Jurisdiction…………………………………………………….....10

Statement of the Issues ………………………………………………………...10

Statement of the Case……………………………………………………..12

      Nature of Case……………………………………………………………12
      Course of Proceedings and Dispositions in the Court Below………………12
      Statement of the Facts……………………………………………………13
      Standard of Review………………………………………………………20

Summary of Argument .................. …………………………………………20

Argument and Citations of Authority ............ …………………………………21

  A. Reasonable jurors could find it objectively unreasonable under the Fourth Amendment to repeatedly punch and kick an overpowered and subdued suspect who was incapable of meaningful resistance……………………...21

  B. The Defendant officers are not entitled to qualified immunity because their conduct, when viewed in the light most favorable to Plaintiff on summary judgment, violated clearly established 11th Circuit law…………………...31

  C. Cobb County is liable because its police department has a custom and practice of condoning excessive force through use-of-force reports that overstate threat level and understate the level of force with the help of an inadequate use of force policy that fails to distinguish between active and passive resistance, causing officers to use excessive force…………..……38

  D. The trial court erred by disregarding Plaintiff's response to Defendants' statement of material facts, as well as Plaintiff's own statement of material facts, summary judgment brief, and the plethora of evidence in the record from which jurors could find that excessive force was used………………43

E. The trial court erred by discrediting the testimony of Plaintiff's well-credentialed law enforcement expert and substituting its own opinions for that of the expert, despite there being no *Daubert* challenge to either side's experts, because the sole judge of the weight and credibility of dueling expert testimony is the jury and not the court……………………………...50

F. Reasonable jurors could find the unreasonable use of force in this case to be a tort or constitutional violation under Georgia law for which there is no official immunity…………………………………………..………………52

Conclusion…………………………………………………………………………...56

Certificate of Compliance…………………………………………………………....56

Certificate of Service………………………………………………………………...57

# TABLE OF AUTHORITIES

CASES

*Adams v. Hazelwood*, 271 Ga. 414, 520 S.E. 2d 896 (1999)……………………...54

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970)……………………………….39

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)……………………………..33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)…………………………50

*Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, No. 21-10619,
    2022 WL 4100687 (11th Cir. 9/8/2022)…………………………………40

*Chesnut v. Correctional Health Care Companies, Inc.*,
    No. 4:15-cv-00166-CDL (M.D. Ga. 6/1/2017)*.………………….……36

*City of Canton v. Harris*, 489 U.S. 378 (1989)…………………………………...39

*City of East Point v. Smith*, 258 Ga. 111, 365 S.E. 2d 432 (1998)….……………52

*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985)…………….……………..42

*Collins v. Schantz*, No. A23A0741 (Ga. App. 9/26/23),
    *cert. denied* (Ga. 2024)*……………………………………….………..56

*Cross v. Lacey*, No. 3:14-cv-00018-CAR (M.D. Ga. 7/19/17)……………………28

*Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962 (11th Cir. 2022)………...40

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)…5, 11, 49-50

*Dekalb Cty. v. Bailey*, 319 Ga. App. 278, 736 S.E.2d 121 (2012)…………………55

*Draper v. Reynolds*, 278 Ga. App. 401, 629 S.E.2d 476 (2006)…………………53

*Dyksma v. Pierson*, No. 4:17-cv-00041-CDL (M.D. Ga. 7/16/18),
    *affirmed per curiam*, No. 18-13337 (11th Cir. 4/18/19)*.……………...53

*English v. City of Gainesville,* 75 F. 4th 1151 (11th Cir. 2023)*……………..36-37

*Fakouri v. Cadais*, 147 F.2d 667, *cert. denied*, 326 U.S. 742 (5th Cir. 1945)……44

*Fundiller v. City of Cooper City*, 777 F.2d 1436 (11th Cir. 1985)………………..39

*Gardner v. Rogers*, 224 Ga. App. 165, 480 S.E.2d 217 (1996)………………..55

*Gilmere v. City of Atlanta*, 774 F. 2d 1495 (11th Cir. 1985)………………………..41

*Graham v. Connor*, 490 U.S. 386 (1989)………………………………………...23-24

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)……………………………………………31

*Harris v. Coweta County*, 433 F.3d 807 (11th Cir. 2005),* *overruled on*

   *other ground*s, *Scott v. Harris*, 550 U.S. 327 (2007)* …………………….24

*Haves v. City of Miami*, 52 F.3d 918 (11th Cir. 1995)………………………………20

*Hope v. Pelzer*, 536 U.S. 730 (2002)*……………………………….....31, 33, 34

*Heck v. Humphrey*, 512 U.S. 477 (1994)……………………………………………21

*Ingram v. Kubik*, 30 F.4th 1241(11th Cir.), *cert. dismissed*,

   142 S. Ct. 2855 (2022)………………………………………………35, 37

*Jean-Baptiste v. Gutierrez*, 627 F. 3d 816 (11th Cir. 2010)………………………37

*Kidd v. Coates*, 271 Ga. 33, 518 S.E. 2d 124 (1999)…………………………54-55

*Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002)………………………………24, 34

*Leslie v. Ingram*, 786 F.2d 1533 (11th Cir. 1986)…………………………………...24

*McDowell v. Brown,* 392 F. 3d 1283 (11th Cir. 2004)…………………………………43

*Merrow v. Hawkins*, 266 Ga. 390, 467 S.E. 2d 336 (1996)………………………54

*Miller v. City of Atlanta*, No. 1:21-cv-03752-SDG (N.D. Ga. 9/29/22)…………40

*Mobley v. Palm Beach Cty. Sheriff Dept.*, 783 F. 3d 1347 (11th Cir. 2015)……..38

*Monell v. Dept. of Social Services*, 436 U.S. 658 (1978)…………12, 22, 23, 25, 52

*Owen v. City of Independence*, 445 U.S. 622 (1980)…………………………25, 32

*Patel v. City of Madison*, 959 F. 3d 1330 (11th Cir. 2020)……………………34-35

*Pearson v. Callahan*, 555 U.S. 223 (2009)……………………………………………32

*Porter v. Massarelli*, 303 Ga. App. 91, 692 S.E.2d 722 (2010)*…..…………53, 55

*Pruitt v. City of Montgomery*, 771 F.2d 1475 (11th Cir. 1985)………………..25, 32

*Reese v. Herbert*, 527 F.3d 1253 (11th Cir. 2008)…………………………………..28

*Resolution Trust Corp. v. Dunmar Corp*., 43 F.3d 587 (11th Cir. 1995)…………20

*Royal Ins. Co. of Am. v. Joseph Daniel Constr., Inc.*,

    208 F. Supp. 2d 423 (S.D.N.Y. 2002)………….………………………..49

*Saucier v. Katz*, 533 U.S. 194 (2001)……………………………………………..32

*Saunders v. Duke*, 766 F.3d 1262 (11th Cir. 2014)………………………………34

*Sebastian v. Ortiz*, 918 F.3d 1301 (11th Cir. 2019)………………………………35

*Stephens v. DeGiovanni*, 852 F.3d 1298 (11th Cir. 2017)………………………...34

*Taylor v. Riojas*, 141 S. Ct. 52 (2020)…………………………………………….33

*Tennessee v. Garner*, 471 U.S. 1 (1985)………………………………………...23, 24

*Tolan v. Cotton*, 572 U.S. 350 (2014)……………………………………………..44

*Vineyard v. Murray County, Georgia,* 990 F. 2d 1207 (11th Cir. 1993)……………41

*Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002)…………………………..24, 34

*Walker v. City of Sandersville*, No. 5:20-CV-438 (MTT)

    (M.D. Ga. 11/18/21)**\***.................................................................32

*Wayne v. Jarvis*, 197 F.3d 1098 (11th Cir. 1999)…………………………………43

**\*Signifies a case in which Appellant's counsel was directly involved, the relevance of which is explained in footnote 14 on page 52 of this brief.**

## FEDERAL STATUTES, RULES AND CONSTITUTIONAL PROVISIONS

Fourth Amendment …………………4, 10, 12, 17, 21-23, 25, 31, 33-34, 37, 44, 53

28 U.S.C. §1291……………………………………………………………………7

28 U.S.C. §1331……………………………………………………………………..7

28 U.S.C. §1367……………………………………………………………………7

42 U.S.C. §1983………………………………………………………12, 22, 39, 53

Fed. R. Civ. P. 1……………………………………………………………………..45

Fed. R. Civ. P. 56…………………………………………………………………45

F.R.E. 404…………………………………………………………………………42

N.D.L.R. 1.1………………………………………………………………………45

## GEORGIA STATUTES AND CONSTITUTIONAL PROVISIONS

GA. CONST. Art. 1, §1, ¶13…………………………………………………....53

GA. CONST. Art. 1, §1, ¶17………………………………………………..…53

O.C.G.A. §16-3-21……………………………………………………….53-54

O.C.G.A. §51-1-1………………………………………………………………53

O.C.G.A. §51-1-13…………………………………………………………..52

O.C.G.A. §51-1-14…………………………………………………………..52

## STATEMENT REGARDING ORAL ARGUMENT

Appellant does not believe oral argument is necessary because the trial court errors enumerated below are readily apparent from the briefing, but Appellant will gladly participate if argument is granted.

## STATEMENT OF JURISDICTION

**A.    Basis for District Court's Subject Matter Jurisdiction.**

The District Court had subject matter jurisdiction over the instant case pursuant to 28 U.S.C. §§1331 and 1367.

**B.    Basis for Appellate Court's Subject Matter Jurisdiction.**

This is a direct appeal from a final judgment of the District Court, for which this Court has subject matter jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

A.    Whether reasonable jurors could find that it was objectively unreasonable under the Fourth Amendment for multiple police officers, after pinning a nonviolent suspect to the ground at the culmination of a foot chase from the scene of a property crime, to repeatedly strike his head and torso with closed fists, kicks, and elbow strikes with sufficient force to break six ribs and cause a life-threatening collapsed lung, when the suspect is unarmed and has not used or threatened violence.

B.  Whether it is clearly established law that it is unreasonable for a police officer to inflict serious and life-threatening injuries upon a suspect who poses no imminent lethal threat and is in no position to escape.

C.  Whether Cobb County maintained a custom or policy of tolerating the use of excessive force which led to the constitutional violation in this case.

D.  Whether the trial court erred by disregarding Plaintiff's response to Defendants' statement of material facts, which the court deemed admitted in their entirety because the response failed to comply with a provision in the trial court's standing order requiring each enumerated response to be preceded by a copy of the statement to which it responds, without giving Plaintiff an opportunity to cure the deficiency.

E.  Whether the trial court erred by substituting its own opinions in place of an expert when there was no *Daubert* challenge and the expert's testimony must be given credit on summary judgment.

F.  Whether a jury could find the force used in this case to be a state law tort or constitutional violation for which there is no official immunity.

# STATEMENT OF THE CASE

## Nature of Case

This is a direct appeal from a grant of summary judgment in a federal civil rights action against three county police officers for the use of excessive force in violation of the Fourth Amendment, which also asserts a municipal liability claim against the officers' employer under 42 U.S.C. §1983 and *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978), as well as pendent state law claims against the officers individually.

## Course of Proceedings and Disposition in the Court Below

Plaintiff/Appellant Jamie Cunningham filed his Complaint against Cobb County and five of its police officers in the Northern District of Georgia on April 6, 2022, to which the County Attorney's Office filed an Answer on July 8, 2022. (R. 1, 10). On January 13, 2023, Cunningham two officers once discovery revealed that they had not personally used force against him, filing an Amended Complaint against the three remaining officers who either admitted using force or were shown doing so on bodycam video. (R. 50, 50-1).

On October 21, 2023, two separate motions for summary judgment (R. 79, 85) and supporting briefs (R. 79-1, 85-1) were filed by counsel representing both the County and Defendant officers, and Plaintiff filed a single brief opposing both motions without exceeding the page limits. (R. 88).

The trial court entered an Order granting both motions on March 14, 2024 and a Judgment terminating the case on March 15, 2024. (R. 101, 102).

Plaintiff filed a Notice of Appeal to this Court on March 18, 2024. (R. 105).

The appeal was docketed on March 26 and this brief was filed the very same day.

## Statement of the Facts

Plaintiff's expert William Harmening summarizes the facts as follows:

On July 6, 2020, at approximately 3:30 a.m., officers from the Cobb County Police Department were dispatched to a possible burglary in progress of a used-car dealership located at 621 Veteran's Memorial Highway. Multiple officers responded, and upon approach spotted an individual walking away from the dealership who matched the description provided by a witness. The subject, later identified as Jamie Cunningham (age 58), began running when he spotted the officers and ran into a ditch with a dense thicket of bushes and weeds. Three of the officers—Evan McDonald, Christopher Lake, and Don Galloway—were able to catch up with Cunningham and take him to the ground. As other officers arrived, the officers attempting to handcuff Cunningham began using physical force. Cunningham suffered six fractured ribs and a collapsed lung as a result. Five of the officers present at the scene captured the incident with their body cameras…

Cunningham was transported to a local hospital following his arrest, but before being treated, walked out while he was unguarded and left the area. The next day he went to an emergency room in Chattanooga TN for treatment of his injuries. **It was found that he had suffered six fractured ribs and a collapsed lung**.[1]

---

[1] Because Cunningham knew there was an outstanding warrant for his arrest, he checked into the hospital under the name of Jeff Cunningham [his brother] and advised medical personnel that he had been in an automobile accident [with no mention of why a surgically implanted tube from another hospital was sticking out of his chest].

At least five officers participated in restraining Cunningham. All but McDonald, who at the time of the incident was a trainee, videotaped the incident with their body cams. All were interviewed by Internal Affairs detectives either on September 9, 2020, or September 10, 2020. The officers involved were: Evan McDonald[,] Christopher Lake[,] [John] Galloway[,] [K]arl Thompson [and] Laura Walker.

Officer Galloway's body cam is the clearest in terms of capturing the use of force by McDonald and Lake. Both can be seen delivering closed fist strikes to Cunningham's body and head (beginning at 00:40).2 McDonald can also be see[n] delivering at least one elbow strike (00:57). Both officers admitted to delivering closed fist strikes to Cunningham's head and body during their Internal Affairs interviews. Additionally, Officer Lake's video shows Officer Galloway appearing to deliver a foot strike to Cunningham's body (01:03).

Throughout the encounter, Cunningham appears to be trying to comply but is unable to because of the thick foliage and the chaotic nature of the officers' attempt to handcuff him. At no time does Cunningham attempt to assault the officers in any manner. At worst, he is only passively-resisting, however, it does not appear that he was resisting at all. While the officers stated in their interviews that Cunningham buried his hands beneath his body and refused to give them up and submit to arrest, almost immediately he is seen on his left side with his right hand and arm visible (Lake video at 1:03). This is before Lake begins to deliver closed fist strikes. He remains on his left side, as seen at 01:18 and 01:27 (Lake video) and in exhibit no. 1 [*screenshot from video*].

In terms of threat assessment, there was never a threat to the officers. There was no information dispatched that Cunningham was armed with a weapon, nor did his actions during the physical encounter indicate that he was attempting to use a weapon. While police officers can use some level of physical force to gain a suspect's compliance—

---

2 The officer's videos were manually filed with Defendants' motions. (R. 84). Each officer's video is listed as a separate file, and citations refer to the digital time stamp on the referenced video.

there is no indication on the body cam videos that he was refusing to comply—**any physical force used cannot rise to the level of disabling or deadly force unless there is a commensurate level of threat to the officers. Police officers are trained to know and understand that closed fist strikes to the head, or even to the body with enough force to break bones, will be viewed as disabling or deadly force.**

In this case, the number of officers present must be weighed when determining the appropriateness of the officers' hand strikes. There was no question that with five officers present, and others responding, the potential threat posed by Cunningham if he had become actively resistant was minimal. The proper course of action should have been one involving de-escalation. The officers had Cunningham completely contained and under control, and it would have been appropriate to simply stop what they were doing, verbally de-escalate the situation, and then move Cunningham into a position where handcuffing could have been completed without becoming tangled in the weeds. It is clear from the body cam videos that even after the handcuffs had been applied, Cunningham's hands were tangled in the thicket of weeds.

(R. 26 at 10-13; R. 59 at 11-14) (headings and graphics omitted, emphasis added).[3]

While denying that they used excessive force, the officers admit to striking Mr. Cunningham multiple times in the ribs and head while he lay face down on the ground, outnumbered and overpowered. (R. 90 at 30-37; R. 79-6 at 5-6; R. 91 at 13, 22, 33, 37-39; R. 79-4 at 6-9; R. 92 at 27-28; R. 79-5 at 6; R. 94 at 8-10, 17-18). While both sides and the court have repeatedly state that he did not (or could

---

[3] The trial court had an issue with Cunningham's page cites to Harmening's report, which may have been confusing because he submitted two reports, an original (R. 26) and amended version (R. 56) with slight variations in pagination between them. This brief cites to PACER page numbers of both reports to avoid confusion.

not) produce his "hands" (plural) on to be handcuffed – both being necessary to cuff them together – that is an oversimplification because the video does show that his right hand was available to be handcuffed, and it was the left one that was pinned beneath his body while he was tangled in underbrush with the officers on top of him. (R. 8 at 52-56; R. 94 at 8; R. 26 at 11-12, R. 59 at 12-13, and cites to video therein). The repeated fist strikes, elbow strikes, and kicks by the officers – and lack of meaningful resistance by Cunningham – are also shown by the video. (R. 26 at 10-13, R. 59 at 11-14, and cites to video therein).

"In an effort to determine if the present case was an isolated instance of excessive force or a pattern of such conduct by officers from the Cobb County Police Department, [Plaintiff's expert William Harmening] reviewed nearly four years of use-of-force reports filed by the CCPD." (R. 59 at 15). After reviewing prior use-of-force reports from the years 2017-2020, Harmening decided to enlarge the data sample to include subsequent years to see if the subject incident was part of a continuing pattern over time:

> To get a more complete picture of the CCPD's pattern of excessive force, it was important to review the body cam videos from select 2021 and 2022 cases. While these cases occurred after Mr. Cunningham's arrest, I believe they demonstrate the continued pattern of excessive force that led to Cunningham's serious injuries at a time when he was either passively resisting or not resisting at all.

(R. 59 at 26).

After comparing videos to use-of-force reports for dozens of incidents over a six-year period, Harmening made the following observation:

> Clearly, the Cobb County Police Department has a pattern of using a level of force that is not commensurate with the level of threat. Essentially none of the cases I reviewed involved a major crime, and none involved an active threat to any officer. In most of the cases there were multiple officers present. It would appear to be embedded in the CCPD culture that excessive force, rather than de-escalation, is the default response, and then to overstate the level of resistance in their use-of-force reports, at least those where a narrative is provided.

(*Id.*).

As a result of his review, Harmening identified two distinct patterns of excessive force which lend support to Plaintiff's claim that the violation of Mr. Cunningham's Fourth Amendment rights was caused by deficient customs, policies and practices of the Cobb County Police Department:

> The review of the above cases highlights two obvious patterns with the CCPD. First is an overuse of the Taser. It appears to be used routinely as a compliance weapon, which is not, and often against a fleeing suspect who has committed only a minor crime or no crime at all. There also seems to be little regard for the location of the person being tased, especially on pavement where a fall can cause considerable injury. While this is not a Taser case, the pattern of abuse and disproportionate force in Taser cases is consistent with the pattern in physical force cases such as this one, and together they support my conclusion that the CCPD has a pattern of tolerating and encouraging the use of excessive force which has caused incidents such as the beating of Mr. Cunningham to occur and continue to occur over a period of several years.
>
> **The second obvious pattern is the routine use of significant physical force during an arrest and detention, especially at the**

**conclusion of a foot pursuit where the suspect has demonstrated no assaultive behavior toward the officers. I saw absolutely no efforts to de-escalate a passively resistant person prior to engaging in physical force. In most of the cases I reviewed, there were multiple officers present when the force was used. Indeed, when the decision is made to arrest someone, even for minor crimes, it appears to be the rule rather than the exception that the person will be taken to the ground aggressively and whatever level of physical force is necessary to apply the handcuffs will begin. There is no attempt at de-escalation to avoid injury**, and I even reviewed cases where the officers themselves were preventing the suspect from complying with their own chaotic actions.

It is an expected outcome in policing that inappropriate behavior on a departmental level will lead to more such behavior when the controls that are in place to prevent it (policy, training, discipline, supervision) fail. Research has shown that when inappropriate behavior is allowed or tolerated, it will create a corporate mentality or subcultural demeanor that officers will conform to.

(*Id.* at 34-35) (emphasis added, internal footnote omitted).

In opposition to summary judgment, Plaintiff selected the following excerpts

from Harmening's expert report as best summarizing his opinions:

[1.]     That Officers Lake and McDonald inappropriately and with an excessive level of force struck Cunningham in the head and body multiple times with closed fists and elbows at a time when Cunningham was either passively resisting or not resisting at all, and as a result, caused Cunningham to suffer multiple fractured bones and a collapsed lung….

[2.]     That the Cobb County Police Department has a demonstrated pattern of using excessive force against passively or non-resistant subjects who attempt to flee on foot, regardless of the severity of their suspected crimes. It is a pattern of conduct that results from Internal Affairs investigators and department managers—field supervisors all the way up to the department's Chief—tolerating and/or turning a

blind eye to misconduct, including the inappropriate and excessive use of force.

(*Id.* at 36-37).

Contributing to this pattern of excessive force is a deficiency in the department's written policy that contributes to the continuation of the pattern:

> The obvious deficiency is that the policy does not prohibit striking the head and neck with closed fists unless deadly force is justified. This is a standard prohibition discussed in police training throughout the U.S. While "distraction blows" are allowed, such blows are open-handed and designed only to momentarily distract rather than injure. Also, the CCPD policy describes "techniques." Closed fist strikes to the back of the head, strikes to the ribs capable of causing fractures, and elbow strikes as seen in the body cam videos[2], are NOT taught "techniques." They are self-defense measures that are justified only when facing an imminent threat of death or serious injury. The CCPD policy even fails to define or draw a distinction in its use-of-force policy between "passive" and "active" resistance.

(R. 26 at 13-14; R. 59 at 14-15). The trial court decided this point was waived (R. 101 at 25, fn. 8) because it was not raised as an independent argument in Plaintiff's summary judgment brief, but it was raised in the expert report cited by the brief, as evidence supporting the pattern whether framed as a separate legal argument or not. (*See* R. 59 at 36, where Harmening describes "a demonstrated pattern of using excessive force *against passively or non-resistant subjects*," and certainly the lack of guidance by written policy is relevant to understanding that pattern). The case relied by the trial court to deem this point "abandoned" is distinguishable because *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) relates

to a "ground alleged in the complaint but not relied upon in summary judgment," while the policy deficiency in this case *was* relied on in summary judgment as evidence in support of a broader argument.

At trial, Plaintiff will also offer the expert medical testimony of Dr. Kris Sperry to establish the causal connection between the blows struck by the officers and the injuries suffered by Cunningham. To rebut the opinion of Defendant's expert Dr. Downs – who worked briefly for Dr. Sperry at the GBI when Sperry was the Chief Medical Examiner for the State of Georgia – that Cunningham's six broken ribs and collapsed lung were likely caused by the fall to the ground when he was tackled by officers, Dr. Sperry will testify based on his review of records and x-ray films that the rib fractures were clearly caused by intentional blows rather than a fall. (R. 69 at 5; R. 83 at 47). Dr. Sperry also says the collapsed lung suffered by Cunningham is a serious injury capable of causing death. (R. 69 at 5).

**Standard of Review**

This Court reviews the decision to grant summary judgment *de novo*, applying the same legal standards which bound the district court. *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

## SUMMARY OF ARGUMENT

This is a straightforward police excessive force case involving an unsympathetic Plaintiff who committed multiple crimes for which he pled guilty

and is now in prison. But the Bill of Rights protects the guilty as well as the innocent – and undoubtedly applies more often to the former than the latter – so the fact that Plaintiff is an outlaw is a mere distraction that entitles rather than disqualifies him from the protections of the Fourth Amendment.

Simply put, Plaintiff was beaten savagely and unnecessarily by police officers who chased him down on foot, beating and kicking him repeatedly until he suffered multiple broken ribs and a life-threatening collapsed lung after fleeing the scene of a property crime. Transported to a local hospital by ambulance for the injuries inflicted by Cobb County police, he was left unguarded and escaped the hospital, allowing him to impulsively steal a hospital security vehicle left unoccupied with the engine running and drive out of state in a foolish attempt to avoid jail. But realizing the seriousness of his injuries outweighed the risk of capture, he checked into a Tennessee hospital under his brother's name with a chest tube inserted at the first hospital still sticking from a hole in his ribcage.

Not surprisingly, Cunningham was arrested in due course and sent to prison as punishment for his crimes,[4] but the Constitution did not authorize the additional

_____

[4] While his conviction included a charge for obstruction of officers, he was only charged under one specific subsection of the statute that pertains to fleeing and eluding. He was not charged with physically resisting officers, so the obstruction conviction has no impact on his excessive force claim under *Heck v. Humphrey*, 512 U.S. 477 (1994), nor has the *Heck* doctrine been raised by Defendants.

punishment of being subjected to excessive force during his arrest. While there are undeniable negatives which Plaintiff must overcome before a jury will award him compensation, there can be no question that he is entitled to have a jury decide the reasonableness of how he was seized under clearly established Fourth Amendment law for which there is no qualified immunity.

In addition to bringing a Fourth Amendment excessive force claim under 42 U.S.C. §1983 against the individual officers who beat him, Mr. Cunningham also seeks to hold Cobb County[5] liable for the actions of its officers under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978) and its progeny, which provide that the officer's employer can be held liable for their actions to the extent that a custom, policy or practice of the county's police department caused the Plaintiff's rights to be violated. The *Monell* claim alleges that the department has maintained a pattern of looking the other way when officers use excessive force, habitually mischaracterizing incidents as 'minimal force in response to active resistance' when video recordings demonstrate otherwise. Consequently, internal investigations tend to conceal the use of flagrantly disproportionate force in response to mere noncompliance or passive resistance – which is what occurred in this case – by downplaying the level of force used and exaggerating the alleged

---

[5] The Cobb County Police Department ("CCPD") is a department of county government that is separate and apart from the sheriff's office, so the perennial question of whether a sheriff acts for the state or county is not at issue.

threat posed by the suspect, so that there are no consequences when excessive force is used. In support of the *Monell* claim, Plaintiff's counsel relies on the expert opinion of a well-credentialed criminologist and former police officer, who reviewed hundreds of police reports and videos to conclude that the officers in this case were part of a pattern of routinely tolerating – and thereby encouraging – the continued use of excessive force for which the county can be held liable.

## ARGUMENT AND CITATION OF AUTHORITY

A. **Reasonable jurors could find it objectively unreasonable under the Fourth Amendment to repeatedly punch and kick an overpowered and subdued suspect who was incapable of meaningful resistance.**

The constitutionality of a police officer's use of force during an arrest or investigatory stop is evaluated under the objective reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386 (1989).

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985) (the question is "whether the totality of the circumstances justifie[s] a particular sort of ...

seizure")).[6] (emphasis added, internal citations and punctuation omitted). In short, "*Graham* dictates unambiguously that **the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force**." *Harris v. Coweta County*, 433 F.3d 807, 818 (11th Cir. 2005), *overruled on other grounds*, *Scott v. Harris*, 550 U.S. 327 (2007) (citing *Lee v. Ferraro*, 284 F.3d 1188, 1197-98 (11th Cir. 2002) (emphasis added).

Since *Graham* was decided more than three decades ago, the Eleventh Circuit has added the following factors to the non-exhaustive list to be considered in evaluating the totality of the circumstances surrounding a given use of force: (1) the need for the application of force; (2) the relationship between the need and amount of force used; and (3) the extent of the injury inflicted. 284 F.3d at 1197-1198 (citing *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986)); *see also Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). Weighing the above factors – severity of the crime versus severity of the injury, active resistance versus attempted flight, and immediacy of threat versus ease of later apprehension – in the light most favorable to Plaintiff as the nonmoving party, a jury could find that the "the totality of the circumstances" did not justify the level of force used in this

---

[6] Like Cunningham, the suspect in *Garner* was fleeing the scene of a burglary (assuming that breaking the window of a closed business and running away is properly described as 'burglary,' although it was indicted as second-degree burglary and Cunningham pled guilty as part of a negotiated plea deal).

case.  While it is also true that jurors could choose to accept Defendant's version of the facts and conclude otherwise, the Court cannot do that as a matter of law on summary judgment.

Even assuming for the sake of argument that the Defendant officers were entitled to qualified immunity, that would have no bearing on the county's *Monell* liability if the jury could find an underlying Fourth Amendment violation under a proper view of the facts.  *See, generally, Owen v. City of Independence*, 445 U.S. 622 (1980) (qualified immunity not a defense for municipality); *Pruitt v. City of Montgomery*, 771 F.2d 1475 (11th Cir. 1985) (municipal liability can exist irrespective of whether officers are individually liable).  Because there is a *Monell* claim in the case, the Court is forced to address the issue of whether there is a Fourth Amendment violation.  The Court cannot sidestep that issue merely by ruling that the law is not clearly established, which would only bear upon the liability of the Defendant officers and not the liability of the county itself.[7]

---

[7] The following section of this brief discusses the two-pronged qualified immunity analysis mandated by the Supreme Court, which in this case requires the Court to address the question of whether a constitutional violation occurred independently of the question of whether the law is clearly established for immunity purposes. While it might be possible in the abstract to rule that the law is unclear *and* no municipal policy (defective or otherwise) caused the officer to do whatever he did (constitutional or otherwise), it is difficult as a practical matter to imagine how a court could address the *Monell* issue without first deciding whether the facts support a constitutional violation.  Defining the parameters of the constitutional right in question is an essential prerequisite to assessing what customs, policies, or

According to Plaintiff's expert, the use of force in this case was inconsistent with national training standards adopted by the professional law enforcement community.    (R. 26 at 11-14, 23; R. 59 at 12-14, 36).[8]  Under those standards, a jury could find it unreasonable for three young officers to beat an unarmed middle-aged man for failing to immediately comply with their verbal commands when he is not violent or physically combative.  As Harmening noted, "there was never a threat to the officers" and "[t]here was no information dispatched that Cunningham was armed with a weapon, nor did his actions during the physical encounter indicate that he was attempting to use a weapon." (R. 26 at 12; R. 59 at 13).

Because blows to the head, as well as closed-fist strikes to the torso capable of breaking bones and collapsing lungs, can cause serious injury or even death, they cannot be used in the absence of justification for the use of deadly force – which requires that the suspect himself pose a lethal threat.   According to Harmening, who has decades of experience in training law enforcement officers,

> While police officers can use some level of physical force to gain a suspect's compliance—there is no indication on the body cam videos that he was refusing to comply—**any physical force used cannot rise to the level of disabling or deadly force unless there is a commensurate level of threat to the officers. Police officers are**

practices led to its violation.

[8] Harmening supplemented his original report (R. 26) with a second report (R. 59) after reviewing new material pertinent to the *Monell* claim.

**trained to know and understand that closed fist strikes to the head, or even to the body with enough force to break bones, will be viewed as disabling or deadly force.**[9]

(R. 26 at 12; R. 59 at 13) (emphasis added).

While "distraction blows" are allowed, such blows are open-handed and designed only to momentarily distract rather than injure. Also, the CCPD policy describes "techniques." **Closed fist strikes to the back of the head, strikes to the ribs capable of causing fractures, and elbow strikes as seen in the body cam videos**[10], **are NOT taught "techniques."** They are self-defense measures that are justified only when facing an imminent threat of death or serious injury.

(R. 26 at 14; R. 59 at 15) (emphasis added).

Not only was there no justification for the level of force used, but there was nothing to gain by inflicting serious injury upon "an individual who was only passively resisting after committing a non-violent offense (if he was resisting at all)." (R. 26 at 20; R. 59 at 21). If anything, it forced him to be transported to a hospital where he was able to commit further crimes rather than being transported – unharmed, had he been taken without excessive force – directly to the secure confines of the county jail.

The Middle District of Georgia has denied summary judgment in a similar

---

[9] Plaintiff's causation expert, former Chief Medical Examiner for the State of Georgia, confirms that the injuries suffered by Cunningham were serious and potentially fatal. (R. 69 at 5).

[10] [*Footnote 2 in original*] The particular type of elbow strike delivered by McDonald is referred to as "12-6," and is banned even in the MMA (Mixed Martial Arts).

factual context, noting as follows:

> [A]ssuming a jury believes Plaintiff's version, once on the ground,
> Plaintiff no longer posed a threat to Defendant, herself, or anyone
> else. Defendant was on top of Plaintiff in a mounted position with his
> knees straddling her. Plaintiff could not move her hands or arms and
> had ceased resisting arrest. Though it took Defendant several minutes
> to get Plaintiff on her stomach and secured in handcuffs, she was
> subdued at all times. Accordingly, it does not appear Plaintiff was a
> threat to Defendant's safety while she was on the ground.

*Cross v. Lacey*, No. 3:14-cv-00018-CAR, Doc. 48 at 19-20 (M.D. Ga. 7/19/17).

Though that case was unpublished, it was based upon clearly established law that

not only existed at the time of the 2017 decision, but which also put officers on

notice at the time of the 2012 incident that "Defendant's actions of repeatedly

punching Plaintiff in the face and head after she stopped resisting arrest and was

subdued on the ground constitute excessive force." *Id.* at 21 (citing *Reese v.*

*Herbert*, 527 F.3d 1253, 1274 (11th Cir. 2008) ("In review of the fact that

[plaintiff] was lying face down on the ground, was not suspected of having

committed a serious crime, did not pose an immediate threat of harm to anyone,

and was not actively resisting or evading arrest, the defendants' use of force was a

wholly disproportionate response to the situation.").

The trial court distinguishes that case because the underlying offense was a

traffic violation rather than a "burglary." But in both instances, the suspects

disobeyed officers' commands to stop and ran from them, meaning they both

committed the crimes of obstruction and fleeing and eluding before the officers used force against them. And neither suspect posed "an immediate threat of harm to anyone" nor was "actively resisting or evading arrest," and both cases are materially similar because "the defendants' use of force was a wholly disproportionate response to the situation," or so a reasonable jury could conclude.

Rather than viewing the totality of the evidence in the light most favorable to Cunningham, the trial court seized upon multiple opportunities to do the opposite. Here are a few illustrative examples of how the trial court downplayed facts favorable to the Plaintiff:

a) The court claims the video shows Cunningham was never kicked (R. 101 at 6, fn. 6), but that is based on the wrong video – from an officer who was not yet on the scene when the kick occurred. What the court called mere "incidental contact" rather than a deliberate kick by Officer Galloway on Officer Walker's video was not the same kick delivered by Galloway 19 seconds earlier and recorded by Officer Lake's video. (R. 84, Lake Video at 1:08). Ironically, Walker's video does show a "12-6" elbow strike by Officer McDonald to Cuningham's upper body or head – a dangerous technique not taught in police academies and outlawed in the sport of Mixed Martial Arts. (R. 26 at 14; R. 59 at 15; R. 84, Walker Video at 00:56).

b) The court dismisses Plaintiff's denial that he posed no threat as "hindsight" because "he does not point to any facts that would have made it objectively unreasonable for the officers to believe that he did," when – in addition to the testimony of Plaintiff himself – the facts are that the 911 caller mentioned no weapon, the officers saw no weapon, and Cunningham made no attempt to toss a weapon or hold one in his waistband as he ran away from the officers, meaning there was no reason for officers to believe he *did* have a weapon. (R. 26 at 12; R. 59 at 13).

c) The court says Plaintiff did not respond to any of the officers' commands to show his hands when the video shows that he was lying on his left side – with his right arm and hand clearly visible and able to be handcuffed. It was his left hand that was stuck beneath him, and he could not move it while tangled in vines, pinned to the ground, and being punched, kicked, and elbowed by three officers. (R. 26 at 12; R. 59 at 13).

d) When the trial court stated that "a reasonable officer at the scene *could have* concluded Plaintiff's failure to comply was intentional and that he posed a threat" (R. 101 at 15), the fact that officers "could have" so concluded is an acknowledgement that they "could have" also concluded otherwise – as does Plaintiff's expert, a reasonable officer himself for more than three decades – such that there is a jury question on that issue.

In any event, an intentional "failure to comply" is mere passive resistance not rising to the level of active, physical resistance justifying brute force – and certainly not a lethal threat authorizing the breaking of bones or damage to vital organs. (R. 26 at 13-14, 16, 18; R. 59 at 14-15, 17, 19).

When this and all the other evidence is viewed in the proper light, there is a clearly a question of fact as to whether Jamie Cunningham was subjected to excessive and disproportionate force amounting to an unreasonable seizure of his person in violation of the Fourth Amendment. While the trial court clearly makes some valid points in Defendants' favor, those arguments must be made to a jury.

**B. <u>The Defendant officers are not entitled to qualified immunity because their conduct, when viewed in the light most favorable to Plaintiff on summary judgment, violated clearly established 11th Circuit law.</u>**

The doctrine of qualified immunity protects public officials from monetary liability when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), cited in *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). In determining whether an individual official is entitled to qualified immunity, there are two inquiries involved:

(1) The Court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right; and

(2) The Court must determine whether the right allegedly violated was

clearly established under the law which existed at the time of the alleged

violation.

*Saucier v. Katz*, 533 U.S. 194 (2001) (directing courts to address those questions in

sequential order), *as modified by Pearson v. Callahan*, 555 U.S. 223 (2009)

(allowing courts to address those questions in the order they see fit).  As stated in

the previous section of this brief, the presence of a *Monell* claim in this case is a

compelling reason to address the first prong first, because it is possible to have

municipal liability (discussed in the next section) for a constitutional violation even

if the individual Defendant has qualified immunity from personal liability

exposure.[11]  Secondly, it is not necessary (or practical, for the reasons stated in the

footnote below) to consider the existence of a *Monell* custom, policy or practice if

there is no constitutional violation in the first place.

Under the first prong of the qualified immunity analysis, there is clearly a

jury question as to the existence of a Fourth Amendment violation based on the

video and the testimony of Plaintiff's expert.  As for the second inquiry, "the

contours of the right must be sufficiently clear that a reasonable official would

---

[11] *See, generally, Owen v. City of Independence*, 445 U.S. 622 (1980) (qualified immunity not a defense for municipality); *Pruitt v. City of Montgomery*, 771 F.2d 1475 (11th Cir. 1985) (municipal liability can exist irrespective of whether officers are individually liable); *Walker v. City of Sandersville*, No. 5:20-CV-438 (MTT) (M.D. Ga. 11/18/21) (qualified immunity not an issue when only the city is sued).

understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). All that is required is that "in the light of pre-existing law, the unlawfulness must be apparent." *Id.* "[T]he salient question … is whether the state of the law [at the time of the alleged conduct] gave [officers] fair warning that their alleged [conduct] was unconstitutional." *Hope*, 536 U.S. at 741. One way to show 'fair warning' is by pointing to a prior case with similar facts, but that is not the only way to do so. *Id; see also Taylor v. Riojas*, 141 S. Ct. 52 (2020) (reiterating *Hope*'s holding recognizing that a general constitutional rule may apply with "obvious clarity to the specific conduct in question," even though the challenged conduct has not previously been held unlawful).

Under *Hope*, a factually identical precedent is not required if a "rule already identified by the decisional law" is articulated with sufficient clarity that it is not dependent on the peculiar facts of the case from which it arose. Such a rule can even be derived from dicta in view of *Hope*'s reliance upon "the reasoning, but not the holding," of prior litigated cases. 536 U.S. at 743. It is not necessary to show that "the very action in question has been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640. In other words,

> [I]f some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional without tying that determination to a particularized set of facts, the decision on "X Conduct" can be

read as having clearly established a constitutional principle: put differently, the precise facts surrounding "X Conduct" are immaterial to the violation. These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances."

*Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002) (citing *Hope*).

Viewing this case in the context of Eleventh Circuit authority, the relevant law has long been clearly established by both factually similar precedent and general rules that apply with obvious clarity to the facts at hand.

We have held that police officers cannot employ gratuitous and seriously injurious force against non-resisting suspects who are under control. *See, e.g., Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014) ("We have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands."); *Lee [v. Ferraro]*, 284 F.3d [1188, 1200 (11th Cir. 2002) (relying on "the clear and obvious principle that once an arrest has been fully secured and any potential danger or risk of flight vitiated, a police officer cannot employ ... severe and unnecessary force"). And we have explained that "**the same rationale applies to the use of gratuitous force when the excessive force is applied prior to the handcuffing but in the course of the investigation.**" *See Stephens v. DeGiovanni*, 852 F.3d 1298, 1328 & n.33 (11th Cir. 2017); *see also Patel [v. City of Madison*, 959 F. 3d 1330, 1340 (11th Cir. 2020)] (citing *DeGiovanni*, 852 F.3d at 1328, n. 33 (**rejecting the "argu[ment] that our precedent prohibiting the use of gratuitous and excessive force against non-resisting suspects applies only when the suspect is handcuffed**"). Based on precedents that preceded Kubik's conduct, we have explained that "**our case law is clear that serious and substantial injuries caused during a suspect's arrest when a suspect is neither resisting an officer's commands nor posing a risk of flight may substantiate an excessive force claim.**" *Sebastian [v. Ortiz]*, 918 F.3d [1301, 1310–11 (11th Cir. 2019)] (examining case law from 1997 to 2017); *see also Patel*, 959 F.3d at 1343 ("**[O]ur**

**cases establishing this principle date to at least 2000**.").

*Ingram v. Kubik*, 30 F.4th 1241, 1252–53 (11th Cir.), *cert. dismissed*, 142 S. Ct. 2855 (2022) (emphasis added).

Even though *Ingram* is a published decision holding that it has "long been clearly established" for more than twenty years that "police officers cannot employ gratuitous and seriously injurious force against non-resisting suspects who are under control," the trial court attempts to distinguish it. Failing to recognize that there is a factual dispute on this issue, the trial court summarily dismisses *Ingram*:

> As already explained, however, Plaintiff was clearly resisting arrest and was not under control. So this doesn't apply to him. …[E]ven if Ingram could have put the Defendant Officers on notice about the unconstitutional nature of punching and elbowing a non-resisting, compliant suspect, it does nothing to inform them that their conduct was unconstitutional as to Plaintiff.

(R. 101 at 20). The trial court's reasoning is faulty for two reasons. First of all, *Ingram* was decided after the incident in this case so it could not have informed the officers of anything, but it does apply principles established 20 years prior to an incident which occurred before the arrest of Mr. Cunningham. Secondly and more importantly, the court's declaration that that the clearly established rule reiterated by *Ingram* "does not apply to him" misses the point that the *rule* itself is clearly established, and the proper question on summary judgment is not whether the rule applies but whether the facts of this case support a finding that it was violated

under Cunningham's view of the evidence.

In a recent decision written by Chief Judge Pryor, this Court rejected an interlocutory appeal on qualified immunity where the dispute was over facts – that is, whether a jury could find that excessive force was used, and not the purely legal question of whether the applicable law on use of force was clearly established:

> The district court also considered the officers' argument that English's constitutional right to be free from excessive force in these circumstances was not clearly established. The district court explained that deadly force is justified only where a reasonable officer would believe that the suspect "posed an *immediate* threat of serious physical harm." The officers argued, as they do here, that English in fact posed an immediate threat.
>
> Again, the district court ruled against the officers because of a genuine dispute of material fact. It determined that "[u]nder Plaintiffs' version of the facts, these circumstances did not exist: the video evidence showed that Mr. English was not fleeing . . . or resisting . . . [or] threatening the officers, himself, or anyone else." In other words, upon reviewing the evidence, "a reasonable jury could view the sequence of events differently than [the officers] said they did." The district court acknowledged that the officers "contest several of these points" and contend "that they do not accurately depict the scene as they encountered it." But the dispute is about what the evidence could prove at trial; it is not a dispute about principles of law.
>
> To be sure, the officers try to cast their arguments as legal disputes. But this appeal does not raise questions about whether certain undisputed conduct violated the Fourth Amendment or whether the law was clearly established. **The parties agree that the use of deadly force against a non-resisting suspect who *poses no danger* violates a suspect's Fourth Amendment right to be free from excessive force.** The dispute is whether English—in fact—posed a danger when the shooting occurred. In other words, the only issues in this appeal

concern what happened at the scene. **Those are questions of fact, not law.**

*English v. City of Gainesville,* 75 F. 4th 1151, ___, No. 22-10927, slip op. at 9 (11th Cir. 2023) (emphasis added).  As in this case, the issue is not whether it is clearly unconstitutional to use potentially lethal force against a suspect who does not himself pose an immediate lethal threat, but whether that is in fact what happened here.  It is up to the jurors to decide whether to believe the former Chief Medical Examiner for the GBI when he testifies that a collapsed lung can cause death (R. 69 at 5)[12] to someone who is incapable of meaningful resistance when outnumbered, overpowered, and pinned to the ground.

Instead of following clearly established precedent that prohibits the use of disproportionate force to restrain a nonviolent suspect – whether handcuffed or not – after he is overpowered and incapable of meaningful resistance or flight, the trial court relies on decisions that are not materially similar to the case at bar.  *Ingram*, 30 F. 4th at 1252–53. The court cites *Jean-Baptiste v. Gutierrez*, 627 F. 3d 816, 821 (11th Cir. 2010) for the proposition that "a police officer is entitled to continue his [or her] use of force until a suspect *thought to be armed* is 'fully secured,' but the suspects in that case had just committed acts of armed violence and were

_____

[12] In fact, a collapsed lung was the cause of death in another civil rights case handled by Appellant's counsel.  *Chesnut v. Correctional Health Care Companies, Inc.*, No. 4:15-cv-00166-CDL (M.D. Ga. 6/1/2017).

known to be armed. They had done more than merely break a shop window, walk away from the scene, and then start running when approached by officers. The trial court also cites *Mobley v. Palm Beach Cty. Sheriff Dept.*, 783 F. 3d 1347, 1355 (11th Cir. 2015), which is distinguishable because the suspect in that case – even though he, like Cunningham, was not believed to be armed – had just committed a violent crime by purposely striking a police officer with his car and leading police on a dangerous high-speed pursuit, making him an imminent threat to both officers and the public.

Viewing the facts in the light most favorable to Cunningham, the Defendant officers violated clearly established law and are not entitled to qualified immunity.

**C.** **Cobb County is liable because its police department has a custom and practice of condoning excessive force through use-of-force reports that overstate threat level and understate the level of force with the help of an inadequate use of force policy that fails to distinguish between active and passive resistance, causing officers to use excessive force.**

Because there is no *respondeat superior* liability under Section 1983, the only way the county can be held liable under federal law is if Cunningham's rights were violated because of a custom or policy of the county's police department. *Monell v. Department of Social Servs.*, 436 U.S. 658, 690 (1978). To establish municipal liability under *Monell*, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) a causal link between the policy or custom and an alleged constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378

(1989). While there is expert testimony that this police department had a custom of tolerating excessive force that was implicitly unconstitutional, it is not necessary under *Harris* to prove that this custom or pattern of conduct was unconstitutional on its face, but only that it caused the rights of this Plaintiff to be violated. *Id.* at 385.

The Supreme Court has defined the term "custom" to include "persistent and widespread ... practices," "permanent and well settled" practices, and "deeply embedded traditional ways of carrying out policy." *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir. 1985) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)). That would include a pattern of tolerating and enabling the use of excessive force by fudging language in reports so that it goes undetected and unaddressed by superiors – for instance by overstating a suspect's level of resistance and understating the level of force used when the language of the report is compared side-by-side with video of the incident, as was done by Plaintiff's expert in this case.

In the words of Plaintiff's expert William Harmening, "CCPD has a pattern of tolerating and encouraging the use of excessive force which has caused incidents such as the beating of Mr. Cunningham to occur and continue to occur over a period of several years." (R. 59 at 36). Based on his review of several dozen similar incidents, Harmening's report continues as follows:

39

The second obvious pattern is the routine use of significant physical force during an arrest and detention, especially at the conclusion of a foot pursuit where the suspect has demonstrated no assaultive behavior toward the officers. I saw absolutely no efforts to de-escalate a passively resistant person prior to engaging in physical force. In most of the cases I reviewed, there were multiple officers present when the force was used. Indeed, when the decision is made to arrest someone, even for minor crimes, it appears to be the rule rather than the exception that the person will be taken to the ground aggressively and whatever level of physical force is necessary to apply the handcuffs will begin. There is no attempt at de-escalation to avoid injury, and I even reviewed cases where the officers themselves were preventing the suspect from complying with their own chaotic actions.

(R. 59 at 34-35).

Harmening's opinions are based on the review of several dozen similar incidents where he compared the use of force reports – which, unlike standard incident or arrest reports – include specific details about the level of resistance and the level of force used so that supervisors can evaluate the proportionality of the force to the threat. The patterns identified by his research create a genuine issue of material fact as to whether the county has *Monell* liability for unwritten policies or customs of its police department which lead to the use of excessive force.

To show a relevant custom or policy, a plaintiff can (1) identify an official policy; (2) identify an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law; **or** (3) identify a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights.

*Miller v. City of Atlanta*, No. 1:21-cv-03752-SDG, Doc. 57 at 34 (N.D. Ga.

9/29/22) (citing *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, No. 21-10619, 2022 WL 4100687, at *3 (11th Cir. Sept. 8, 2022) and *Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 966–68 (11th Cir. 2022) (emphasis added to emphasize disjunctive).

A custom, policy, or practice may be inferred from a pattern of excessive force. If the defendant's department has a pattern of failing to discipline officers who have committed acts of excessive force, then a case can be made that the actual unwritten policy of the department is to condone excessive force rather than prohibit it—regardless of what the department's written policy might say. *See Gilmere v. City of Atlanta*, 774 F. 2d 1495, 1503 n. 9 (11th Cir. 1985); *see also Vineyard v. Murray County, Georgia,* 990 F. 2d 1207, 1212 (11th Cir. 1993) ("the evidence demonstrates that the Sheriff's Department had inadequate procedures for recording and following up complaints against individual officers...").

While a single incident is insufficient to establish a custom or pattern, *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985), the expert testimony in this case has identified dozens of use-of-force reports where officer narratives do not match the video. If reasonable jurors could find from that testimony – as well as draw their own inferences from the many similar incidents which are admissible to show a pattern under F.R.E. 404 – that there was a pattern of excusing and thus enabling the continued use of excessive force, Cobb County is not entitled to summary judgment

on the *Monell* claim.

Interestingly, Harmening points to a document in which a Cobb County police administrator seems to admit the existence of such a pattern and the need to address it with changes in policy:

> It can be surmised that by 2022, the CCPD realized it had a problem with its officers' use of force. The year-end 2021 use of force summary stated "**The Use of Force policy is currently under review to become more in line with state law and case law and reduce confusion and hesitation for the officer which in turn will result in less injury to everyone involved**. The new policy will hopefully be implemented in 2022."

(R. 59 at 30, citing 2021 CCPD Use of Force Summary, p. 12) (emphasis added). This admission alone should defeat summary judgment on the *Monell* claim.

"In order for a plaintiff to demonstrate a policy or custom, it is 'generally necessary to show a persistent and wide-spread practice.'" *McDowell v. Brown,* 392 F. 3d 1283, 1290 (11th Cir. 2004) (citing *Wayne v. Jarvis*, 197 F.3d 1098 (11th Cir. 1999). Thanks to the above admission by an agent of the county that the policy needs improvement, coupled with the rigorous research and testimony of William Harmening, Plaintiffs have met that burden.

Harmening's testimony also allows a jury to find a causal connection between the department's custom and practice of condoning excessive force and the fact that excessive force was used in this case:

It is an expected outcome in policing that inappropriate behavior on a departmental level will lead to more such behavior when the controls that are in place to prevent it (policy, training, discipline, supervision) fail. Research has shown that when inappropriate behavior is allowed or tolerated, it will create a corporate mentality or subcultural demeanor that officers will conform to. [citation omitted] Many departments have attempted to address this issue …

It is clear to me, given the above video analysis, that the Cobb County Police Department has developed a culture among its officers where physical force is overused and excessively so, … and where de-escalation tactics are nearly non-existent in an active arrest situation, regardless of the severity of the crime or the level of resistance. In the case of Jamie Cunningham, that culture was on full display.

(R. 59 at 35-36). Accordingly, there is a jury question as to whether the *Monell* custom or practice identified in this case was a moving force behind the violation of Cunningham's Fourth Amendment right to be free from excessive force.

## D. **The trial court erred by disregarding Plaintiff's response to Defendants' statement of material facts, as well as Plaintiff's own statement of material facts, summary judgment brief, and the plethora of evidence in the record from which jurors could find that excessive force was used.**

The following footnote appears in the trial court decision:

… Plaintiff did not copy into his responses the numbered statements to which he was responding.  The Court admonishes Plaintiff for violating the Standing Order.  The rule is pretty clear and should be followed.  In light of this, citations by the Court that reference either Defendant Officers' or Cobb County's statement of material facts refer to statements that are not factually (or properly) disputed…

(R. 101 at 2, fn. 1).   By its own admission, the trial court appears to be disregarding the record citations which controverted Defendants' statement of

material due to counsel's regrettable failure to follow an instruction as to form which, while understandably making the court's job easier by not forcing it to open two windows at once on the computer screen (except to make sure Plaintiff's counsel has copied Defendant's facts accurately), does not supersede the overarching mandate of Rule 56 to view all facts in the record in the light most favorable to Plaintiff – not just those that are "factually (or properly) disputed" in a single filing on terms dictated by local rules and case management instructions.

"The Rules of Civil Procedure clearly indicate a general policy to disregard technicalities and form, and to determine the rights of litigants on the merits." *Fakouri v. Cadais*, 147 F.2d 667, 669, *cert. denied*, 326 U.S. 742 (5th Cir. 1945). While local rules are essential for managing court proceedings at the district level, they should not undermine the fundamental intent of the Federal Rules of Civil Procedure. The Northern District of Georgia Local Rules recognize that "[t]hese rules supplement the Federal Rules of Civil Procedure and *shall be construed so as to be consistent with those Rules* and to promote the just, efficient, and economical determination of every action and proceeding…" N.D.L.R. 1.1(C) (emphasis added); *see also* Fed. R. Civ. P. 1. Under Rule 56, the court is required to view all evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 350 (2014).

Counsel apologizes for being less diligent than he should be about keeping

abreast of local rule changes.  In the only other case where counsel was aware of a similar requirement, the court issued a deficiency notice and counsel corrected the deficiency immediately.  Because that was a one-time occurrence, counsel assumed that it was just the preference of that judge, but in researching other judges' standing orders in the preparation of this brief, counsel discovered that the form requirement he overlooked is now widespread, so he will no longer follow the old template he used without objection for more than three decades.

While accepting full responsibility for the deficiency, counsel would have corrected it immediately had he been informed about it, and indeed, he did file a corrected version six months later when it was first called to his attention in a footnote to a summary judgment ruling that seems to have improperly affected the outcome.  (R. 103, 104).  Counsel respectfully submits that it was improper to deem Defendant's facts admitted without giving Plaintiff an opportunity to amend – particularly when Plaintiff's response did provide specific and concise citations to the record that were reiterated in his own statements of material facts and brief in opposition to both motions.  (R. 88, 88-1, 88-2, 88-3).

Specifically, Plaintiff's own statement of material facts (R. 88-1), which is the docket entry immediately preceding his response to Defendants' statements (R. 88-2, 88-3), stated his version of the facts as follows:

1. The Defendant officers admit striking Mr. Cunningham multiple times in the ribs and head which he lay face down on the ground, outnumbered and overpowered. (Lake Dep. at 30-37; Lake Aff. (Doc. 79) at pg. 6; McDonald Dep. at 13, 22, 33, 37-39; McDonald Aff. (Doc. 79-4) at pgs. 6-9; Galloway Dep. at 27-28; Galloway Aff. (Doc. 79-5) at pg. 6; Walker Dep. at 8-10, 17-18).

2. While the officers claim that such gratuitous and unnecessary force was justified because he did not produce his hands when commanded to do so, Cunningham was unable to do so because his hands were pinned under his body and tangled in underbrush with the weight of the officers on top of him. (Cunningham Dep. [Doc. 81] at 52-56; Walker Dep. at 8; Doc. 59 at 13-14 and citations to video therein).

3. The repeated fist strikes and kicks by the officers – and lack of meaningful resistance by Cunningham – are also shown by the video. (Doc. 59 at 10-14 and citations to video therein; Doc. 84).

4. As a result of the beating, Cunningham suffered six fractured ribs and a collapsed lung. (Doc. 69 at 4-6).

5. "In an effort to determine if the present case was an isolated instance of excessive force or a pattern of such conduct by officers from the Cobb County Police Department," Plaintiff's expert William Harmening reviewed nearly six years of use-of-force reports filed by the department: four years prior to the incident and two years after. (Doc. 59 at 15, 26)

6. After comparing videos to use-of-force reports for dozens of incidents over a six-year period, Harmening concluded that "Clearly, the Cobb County Police Department has a pattern of using a level of force that is not commensurate with the level of threat… It would appear to be embedded in the CCPD culture that excessive force, rather than de-escalation, is the default response, and then to overstate the level of resistance in their use-of-force reports, at least those where a narrative is provided. (Doc. 59 at 26).

7. This pattern of using force disproportionate to threat level shows up in dozens of incidents involving physical force or Tasers such as "the

routine use of significant physical force during an arrest and detention, especially at the conclusion of a foot pursuit where the suspect has demonstrated no assaultive behavior toward the officers" – including "cases where the officers themselves were preventing the suspect from complying with their own chaotic actions." (Doc. 59 at 34-35).

8. Harmening also opined, based on literature as well as his own experience, that "it is an expected outcome in policing that inappropriate behavior on a departmental level will lead to more such behavior when the controls that are in place to prevent it (policy, training, discipline, supervision) fail. Research has shown that when inappropriate behavior is allowed or tolerated, it will create a corporate mentality or subcultural demeanor that officers will conform to." (Doc. 59 at 34-35) (internal footnote omitted).

9. For purposes of this motion, Plaintiff relies on the following opinions from Mr. Harmening's expert report which summarize his expected testimony at trial:

[1.] That Officers Lake and McDonald inappropriately and with an excessive level of force struck Cunningham in the head and body multiple times with closed fists and elbows at a time when Cunningham was either passively resisting or not resisting at all, and as a result, caused Cunningham to suffer multiple fractured bones and a collapsed lung….

[2.] That the Cobb County Police Department has a demonstrated pattern of using excessive force against passively or non-resistant subjects who attempt to flee on foot, regardless of the severity of their suspected crimes. It is a pattern of conduct that results from Internal Affairs investigators and department managers—field supervisors all the way up to the department's Chief—tolerating and/or turning a blind eye to misconduct, including the inappropriate and excessive use of force.

(*Id.* at 36-37).

10. In addition to the above testimony from a law enforcement expert, Plaintiff

will offer the expert medical testimony of Dr. Kris Sperry to establish the causal connection between the blows struck by the officers and the injuries suffered by Cunningham. To rebut the opinion of Defendant's expert Dr. Downs – who worked briefly for Dr. Sperry at the GBI when Sperry was the Chief Medical Examiner for the State of Georgia – that Cunningham's six broken ribs and collapsed lung were likely caused by the fall to the ground when he was tackled by officers, Dr. Sperry will testify based on his review of records and x-ray films that the rib fractures were clearly caused by intentional blows rather than a fall. (Doc. 69 at 5; Doc. 83 at 47).

11. A collapsed lung i[s] a potentially fatal injury. (Doc. 69 at 5).

12. The fact that the CCPD command staff found no violation of policy by the Defendant officers authorizes an inference that the Department had an unwritten policy, custom or practice of tolerating and enabling the use of excessive force. (Doc. 79-14 at 17).

(R. 88-1). The above statement of facts, irrespective of Plaintiff's responses to Defendant's statement of facts, Plaintiff's brief, and the voluminous record itself, is sufficient standing along to defeat summary judgment.

Yet the trial court had nothing to say about Defendants' deficient response to Plaintiff's statement of material facts. (R. 99). While Defendants did satisfy the form requirement that each fact being responded to be copied into the response, the responses themselves were insufficient because they failed to cite any portions of the record to controvert Plaintiff's facts. Instead, they merely interposed legal objections to every factual statement made by Plaintiff – most of them being some version of 'Defendants object pursuant to L.R. 56.1 (B)(3)(b) because Plaintiff's evidence does not support Plaintiff's fact,' 'is a question of law rather than fact,' or

'is derived from erroneous or incomplete information'[13] without pointing to any facts to rebut Plaintiff's statements. (R. 99). Had the trial court admonished counsel for Defendants rather than Plaintiff for their "laziness," the outcome may have well been different. (R. 101 at 3, fn. 2).

**E.** **The trial court erred by discrediting the testimony of Plaintiff's well-credentialed law enforcement expert and substituting its own opinions for that of the expert, despite there being no *Daubert* challenge to either side's experts, because the sole judge of the weight and credibility of dueling expert testimony is the jury and not the court.**

"The district court is not charged with weighing the correctness of an expert's testimony, nor must the court choose between the testimony of competing expert witnesses." *Royal Ins. Co. of Am. v. Joseph Daniel Constr., Inc.*, 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002). Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof

---

[13] Of course, Plaintiff's statement of facts is based on "incomplete" information because its very purpose is to highlight only those facts which are favorable to Plaintiff, which are the only facts that matter on summary judgment. Defendants' non-response to Plaintiff's statement – and the trial court's selective fixation upon form over substance – calls into question the very need for statements of material fact at all. They are typically just cut and pasted from a party's brief anyway, and they invite the unnecessary parsing of words and potential for mischief and deceit, when both the substantive arguments and the facts supporting them are all in the parties' briefs anyway. They are also a way for parties to circumvent page limits by shifting factual summaries and arguments from the body of the brief to the enumerated statement of material facts, for which there is no page limit. Counsel believes that courts are perfectly capable of discerning factual disputes in the context of a brief without forcing counsel to perform the duplicative exercise of extracting those issues into a numbered list which leads to unnecessary word games about what is controverted, admitted, or simply objectionable.

are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993). As with all testimony, the court must scrupulously avoid making credibility determinations or weighing the evidence, as the jury is the sole arbiter of the facts. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986) ("[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . ").

Accordingly, the trial court veered outside its lane when it chose to disregard William Harmening's testimony because it was "based on incomplete information." (R. 101 at 26). The sole basis for this assertion is that Harmening "claims to have reviewed hundreds Cobb County police reports" – which counsel can vouch for having personally requested those reports and having paid Harmening to review them – with some ambiguity about whether the 'police reports' were incident reports, arrest reports, or use-of-force reports required for statistical purposes. Certainly the use-of-force reports are the most relevant for Harmening's purposes because every officer who uses force in a particular incident is required to do one, which documents the information available to the officer about the threat posed by the suspect, the actions of the suspect which justify the use of force, the level of force used, and the details of how the decision to use force was made. In other words, anything relevant to supervisors to evaluate the

reasonableness of the use of force is put in the use-of-force report, which is why it is also relevant to a court conducting the same evaluation. If three officers use force in the same incident, all three officers must do use-of-force reports, and there will not always be a corresponding incident or arrest report. Where there is an incident or arrest report, less attention is paid to the use of force and the circumstances which led to it than there would be in a use-of-force report specifically tailored to that purpose, which is why they are required in the first place. (R. 59 at 15-16). Moreover, an incident or arrest report will often be prepared by someone not involved in the use of force, such as a supervisor or other responding officer who did not participate in the seizure of the suspect. But any criticism of Harmening's choice to rely on use-of-force reports and videos to evaluate use-of-force incidents goes to the weight of his testimony and is no reason to disregard it altogether. (*Id.*).

The trial court concludes in a footnote that "the expert report is basically useless" after doing exactly what the law says it cannot do: substituting its own judgment for that of "a purported expert" whose "report appears deficient in nearly every way" by claiming that "the Court is in just as good a position to decide what those videos showed." (R. 101 at 28, fn. 9). But the Court does not have time to review hundreds of police reports, compare them to dozens of videos, and analyze that data through the lens of 35 years of law enforcement and relevant academic

experience. (R. 59 at 22-36). That is why experts are needed, and any disagreement with their testimony is for the jury to resolve.[14]

**F.** **Reasonable jurors could find the unreasonable use of force in this case to be a tort or constitutional violation under Georgia law for which there is no official immunity.**

Aside from being a federal constitutional violation, the use of excessive force also amounts to battery under state law, as well as an unreasonable seizure under the Georgia Constitution's analog to the Fourth Amendment. O.C.G.A. §§51-1-13 and 51-1-14 (recognizing cause of action for battery); GA. CONST. Art. 1, §1, ¶13; *City of East Point v. Smith*, 258 Ga. 111, 112, 365 S.E. 2d 432 (1998). Georgia also has a separate constitutional provision which specifically provides that no person shall "be abused in being arrested…" GA. CONST. Art. 1, §1, ¶17. While there is no Georgia law equivalent of 42 U.S.C. §1983 expressly creating a private cause of action for state constitutional violations, O.C.G.A. §51-1-1 does create a cause of action in tort for the violation of any legal duty, public or private,

_____

[14] The trial court suggests that Harmening was used only to give Plaintiff's *Monell* argument "some heightened imprimatur because it came from a purported expert," implying that his counsel would improperly overreach to make an argument not supported by evidence. Counsel is fully aware that *Monell* liability is rarely established, and to that point calls attention to the fact that of the nine cases cited in this brief in which the undersigned counsel was involved, *only one of them* included a *Monell* claim, which was coincidentally successful. *Walker v. City of Sandersville*, No. 5:20-CV-438 (MTT) (M.D. Ga. 11/18/21). Counsel has learned not to bring *Monell* claims unless there is compelling evidence, such as the disturbing pattern of police misconduct in this case which has the potential to harm far more people if allowed to go unchecked.

and the state constitution can be construed to impose legal duties upon public officers. *See Porter v. Massarelli*, 303 Ga. App. 91, 692 S.E.2d 722 (2010). *Porter* has been cited by at least one federal court for the proposition that violations of the Georgia Constitution are actionable as torts:

> … Defendants point out that at least one panel of the Georgia Court of Appeals has cast doubt on whether a plaintiff may bring claims directly under the Georgia Constitution. *See Draper v. Reynolds*, 629 S.E.2d 476, 478 n.2 (Ga. Ct. App. 2006) (noting "that Georgia does not have an equivalent to 42 U.S.C. § 1983"). But another panel of the Georgia Court of Appeals declined to grant summary judgment on a plaintiff's claims under the Georgia Constitution. *Porter v. Massarelli*, 692 S.E.2d 722, 726–27 (Ga. Ct. App. 2010). The Court thus assumes for purposes of this motion that Plaintiffs may assert claims under the Georgia Constitution.

*Dyksma v. Pierson*, No. 4:17-cv-00041-CDL at *29, fn. 6 (M.D. Ga. 7/16/18), *affirmed per curiam*, No. 18-13337 (11th Cir. 4/18/19) (similarly involving life-threatening force against a nonviolent suspect pinned to the ground).

The analytical framework for state law excessive force claims – whether civil or criminal, constitutional or tort – is provided by the self-defense statute, O.C.G.A. §16-3-21, which states in pertinent part as follows:

> (a) A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is *necessary* to defend himself or herself or a third person against such other's imminent use of unlawful force; however, … a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is *necessary* to prevent death

or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

O.C.G.A. §16-3-21(a) (emphasis added). A use of force considered objectively reasonable under federal law might not be "necessary" under state law, so a jury could reach different outcomes on the same facts depending upon which law is applied.

Unlike federal qualified immunity, which is based on clarity of the law, Georgia's doctrine of official immunity protects individual officers from liability for negligence in the performance of discretionary functions. However, it does not apply to discretionary acts like the use of force where the officer acts with "actual malice." *See, e.g., Merrow v. Hawkins*, 266 Ga. 390, 467 S.E. 2d 336 (1996)*; see also Adams v. Hazelwood*, 271 Ga. 414, 520 S.E. 2d 896 (1999). "[I]n the context of official immunity, actual malice means a deliberate intention to do a wrongful act. 266 Ga. at 391, 467 S.E.2d 336. **Such act may be accomplished with or without ill will and whether or not injury was intended**…." 271 Ga. at 415, 520 S.E.2d at 898 (emphasis added).

In the use of force context, the Georgia Supreme Court defines 'actual malice' as acting with "actual intent to cause injury," irrespective whether the officer acted in good faith or bad. *Kidd v. Coates*, 271 Ga. 33, 34, 518 S.E. 2d 124 (1999).

> [I]f Appellees shot Gaddis intentionally and without justification, then they acted solely with the tortious "actual intent to cause injury." *See Gardner v. Rogers*, 224 Ga. App. 165, 169(4), 480 S.E.2d 217 (1996). On the other hand, if Appellees shot Gaddis in self-defense, then they had no actual tortious intent to harm him, but acted only with the justifiable intent which occurs in every case of self-defense, which is to use such force as is reasonably believed to be necessary to prevent death or great bodily injury…

271 Ga. at 33, 518 S.E.2d at 125. It is the presence or absence of legal justification, not feelings of ill will or spite, that determines whether an officer acts with intent to commit an act which is wrongful under the facts. In short, if an officer uses reasonable and necessary force, he is acting in accordance with the self-defense statute and is entitled to official immunity, but if he uses more force than reasonably necessary, he is acting with actual malice and not entitled to official immunity. *See Porter,* 303 Ga. App. 91, 692 S.E.2d 722 (no official immunity if jury finds that shooting of motorist was not reasonably necessary for self-defense).

In other words, if there are reasonable alternatives, then the chosen use of force is not reasonably "necessary." *See also Dekalb Cty. v. Bailey*, 319 Ga. App. 278, 282-283, 736 S.E.2d 121 (2012) (question of fact remained as to an officer's actual malice or intent to injure a man he shot in the back when the officer was "never threatened with a weapon and did not have probable cause to believe that the man running away [from him] had committed a crime involving serious physical

harm") and *Collins v. Schantz*, No. A23A0741 (Ga. App. 9/26/2023), *cert. denied* (Ga. 2024) (genuine question of material fact remained as to whether fleeing motorcyclist was shot in self-defense or "with actual malice or actual intent to injure," affirming denial of summary judgment as to state law torts but not as to constitutional claims).

## CONCLUSION

For the reasons set forth in the foregoing argument of law and citation of authority, Appellant requests that the judgment of the trial court be reversed.

Respectfully submitted this 26th day of June, 2024.

*/s/Craig T. Jones*
CRAIG T. JONES
Attorney for Appellant
Georgia Bar No. 399476

CRAIG T. JONES, P.C.
Post Office Box 66
Savannah, Georgia 31402
(678) 643-0062
craigthomasjones@outlook.com

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Brief of Appellants complies with the 13,000-word limit set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, as modified by 11th Cir. Rule 32-4. From the caption reading "Statement Regarding Oral Argument" to the last sentence of the "Conclusion,"

this Brief contains exactly 12,971 words according to Microsoft Word's word-count function, printed in Times New Roman 14-point typeface.

/s/ Craig T. Jones
Craig T. Jones
Ga. Bar No. 399476
Attorney for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I served the foregoing brief upon the following counsel via the Court's efiling system and U.S. Priority Mail to:

Laura Murphree, Esq.
Lauren Bruce, Esq.
Cobb County Attorney's Office
100 Cherokee Street, Suite 350
Marietta, Georgia 30090-7003

Respectfully submitted this 26th day of March, 2024.

/s/ Craig T. Jones
_____
Craig T. Jones
Georgia Bar No. 399476
Counsel for Appellant

CRAIG T. JONES, P.C.
Post Office Box 66
Savannah, Georgia 31402
(678) 643-0062
craigthomasjones@outlook.com